# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
February 3, 2012

Lyle W. Cayce
Clerk

No. 11-30467
Summary Calendar

IRIS FAIR; ANDREW FAIR; ANITA WRIGHT,

Plaintiffs-Appellants,

versus

BART ALLEN; GATOR SIGN COMPANY;
NATIONWIDE MUTUAL INSURANCE COMPANY,

Defendants-Appellees.

Appeal from the United States District Court
for the Western District of Louisiana

Before REAVLEY, SMITH, and PRADO, Circuit Judges.

JERRY E. SMITH, Circuit Judge.

Iris Fair, Andrew Fair, and Anita Wright were involved in a vehicular acci-
dent with Bart Allen, an employee of Gator Sign Company, whose vehicle hit
plaintiffs' car from behind when they stopped to make a left turn.  Plaintiffs'

No. 11-30467

motion for partial summary judgment on liability was granted, but a jury trial was conducted on damages, resulting in a verdict in favor of the plaintiffs for $38,500 ($21,000 to Iris Fair, $17,500 to Anita Wright, and $0 to Andrew Fair). Plaintiffs claim the district court should have granted their motion for new trial. We affirm.

I.

This case hinges on whether the jury was allowed to find the defendants' expert more credible than plaintiffs'. Each plaintiff testified, and the parties presented numerous treating physicians.

Iris Fair complained of pain in her back, neck, left shoulder, and left neck muscle and numbness in the left side of her face. She was treated by a chiropractor at Chrio Plus, then by Dr. Kenneth Vogel at SoleCARE. He first recommended conservative treatment following an initial MRI that showed mostly normal results with some lumbar herniation or degeneration. Iris Fair later came back complaining that the pain persisted. Vogel found moderate muscle spasms, then conducted a discogram and cervical myelogram. The myelogram was normal, but Vogel offered the cervical neurotomy and IDET annuloplasty. Fair has not worked since the procedure Vogel performed; she still complains of pain, but other diagnostics that have been conducted since then came back normal.

Dr. Vincent Forte, a pain management expert, also testified for Iris Fair, saying she reported constant pain. Her physical exam was normal except for decreased Achilles reflex, numbness and tingling in lower extremities, and less sensitivity to pinpricks. An MRI of her lumbar spine showed disc bulging and desiccation, but her cervical MRI was normal. There were also muscle spasms. A steroid injection temporarily relieved the pain. Forte performed branch nerve block injections (a diagnostic procedure), but after the temporary anesthetic wore off, pain returned. He later performed a neurotomy.

No. 11-30467

Finally, Tammy Steward-Dixon, a family nurse practitioner at SoleCARE, testified that she treated Iris Fair after the accident until she began pain management. Steward-Dixon said that Fair had consistent pain throughout the treatment and said her pain was not just subjective.

Wright went to Homer Memorial Hospital after the accident complaining of back and neck pain. She then went to SoleCARE and Chiro Plus. When Vogel saw her, she complained of neck and back pain and tingling and numbness in her hands. Vogel testified that he found spasms on her neck and lower back, numbness in her fingers, some scoliosis, and joint pain. After trying conservative care, he performed a lumbar discogram and myelogram. The myelogram came back normal, but the discogram showed herniation and a fissure.

A facet arthrogram also showed joints on Wright's right side were causing pain. Vogel performed IDET annuloplasty to repair the disc. After that, most symptoms subsided, but Wright still had spasms, and he told her not to lift, push, or pull heavy objects. She still has pain, but spasms are reduced, her neck is normal and her scoliosis gone. Vogel said that although the MRI had been normal, the discogram confirmed a problem, and MRIs are only 80% accurate.

Dr. John Ledbetter, a pain management expert, testified that after going back to work following the surgical procedure by Vogel, Wright had muscular pain, back and shoulder pain, headaches, and blurred vision. Ledbetter performed a neurotomy procedure to burn the nerves.

Stewart-Dixon testified that Wright was in pain during her treatment. She said the pain was consistent throughout the entire period of treatment.

The defendants' medical expert, Dr. Robert Holladay, testified that the procedures performed on the plaintiffs were not valid. He opined that discograms are not proper diagnostic tools and that other injection procedures, such as IDET annuloplasty, that were done on the plaintiffs should not be performed. Holladay grounded that assessment on studies he had read that he briefly

3

No. 11-30467

described and on the acceptance of those studies by other doctors. Based on his examinations of the medical record, the plaintiffs, and the photos of the accident, he instead determined that plaintiffs had suffered soft-tissue injuries.

## II.

Plaintiffs and the district court cite opposing precedent from this court regarding the correct standard for a motion for new trial. The district court applied federal standards under Federal Rule of Civil Procedure 59, citing *Jones v. Wal-Mart Stores, Inc.*, 870 F.2d 982, 986 (5th Cir. 1989), which says that in diversity cases, "state law determines the type of evidence that must be produced to support a verdict but the sufficiency or the insufficiency of the evidence in relation to the verdict is indisputably governed by a federal standard" (internal quotation marks omitted). The plaintiffs cite *Foradori v. Harris*, 523 F.3d 477, 498 (5th Cir. 2008), for the opposing proposition that the new-trial standards of Louisiana should have been applied: "The Supreme Court in *Gasperini [v. Center for Humanities*, 518 U.S. [415,] 419,434 [(1996)] . . ., held that, in an action based on state law but tried in federal court by reason of diversity of citizenship, a district court must apply a new trial or remittitur standard according to the state's law controlling jury awards for excessiveness or inadequacy. . . ."

Plaintiffs moved for additur and, failing that, new trial. Although both *Jones* and *Foradori* could be applied to this situation, *Foradori*, coming after an intervening Supreme Court decision, controls.[1] Therefore, the district court erred in applying the federal standard; Louisiana law applies.

Although denial of a motion for new trial is reviewed for abuse of discretion, *Munn v. Algee*, 924 F.2d 568, 575 (5th Cir. 1991), the plaintiffs argue that

---

[1] *Jimenez v. Wood Cnty., Tex.*, 621 F.3d 372, 376 (5th Cir. 2010) ("[A] panel of this court can only overrule a prior panel decision if such overruling is unequivocally directed by controlling Supreme Court precedent.") (internal quotation marks omitted).

No. 11-30467

because the district court's ruling was based on its view that the federal standard applies, *de novo* review is proper.[2] Yet, even under *de novo* review, the verdict had adequate support in the record, so the standard of review makes no difference here.

## III.

Despite permitting a trial court to review the jury's credibility determinations, Louisiana gives the jury high deference. Louisiana provides a new trial "[w]hen the verdict or judgment appears clearly contrary to the law and the evidence," LA. CODE CIV. P. art. 1972, and permits the court to grant a new trial "in any case if there is good ground therefor, except as otherwise provided by law," *id.* art. 1973. When granting a new trial, the court can evaluate the evidence, draw it's own inferences and conclusions, and determine whether the jury "erred in giving too much credence to an unreliable witness." *Joseph v. Broussard Rice Mill, Inc.*, 772 So. 2d 94, 104 (La. 2000). Yet, Louisiana courts still accord jury verdicts great deference.[3] Therefore, although the Louisiana Code explicitly allows the district court to overturn a verdict that gives too much cred-

---

[2] *See Munn*, 924 F.2d at 575 ("[W]hen the district court's ruling is predicated on its view of a question of law, it is subject to *de novo* review.").

[3] One court explained,

> [T]he discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is in the province of the jury, and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury's responsibility. A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations and must be viewed in that light. Thus, the jury's verdict should not be set aside if it is supportable by any fair interpretation of the evidence.

*Guillory v. Lee*, 16 So. 3d 1104, 1130 (La. 2009) (quoting *Davis v. Wal-Mart Stores, Inc.*, 774 So. 2d 84, 93 (La. 2000)).

No. 11-30467

ibility to a non-believable witness, that can be applied only in extreme situations.

The plaintiffs attack the verdict on three grounds. First, they rely on two presumptions: (1) the *Lucas/Housely* presumption and (2) the treating physicians presumption.

The *Lucas/Housely* presumption establishes a causal connection between an injury plaintiff suffered and an accident "if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition."[4] Though plaintiffs argue that the presumption was met by their own testimony about being healthy before and the medical expert's testimony about their being injured afterwards, they never succeeded in establishing the prerequisites for the presumption, which requires the symptoms of a disabling condition to appear and to manifest continuously; then it presumes a causal relationship.

The dispute is whether such a disabling condition exists, not whether plaintiffs' injuries came from the accident. Although they and their experts testified that they were disabled and severely injured, defendants argued that the plaintiffs suffered nothing more than soft tissue damage. Because the jury awarded damages consonant with only soft tissue damage, the jury apparently believed the defense. If the jury was wrong to do so, then, it must be wrong for reasons other than the *Lucas/Housely* presumption, because that presumption does not make injuries presumptively disabling.

The presumption in favor of treating physicians helps the plaintiffs, but it is not enough. In Louisiana, the diagnoses and opinions of a treating physi-

---

[4] *Maranto v. Goodyear Tire & Rubber Co.*, 650 So. 2d 757, 759, 761 (La. 1995) (quoting *Housley v. Cerise*, 579 So. 2d 973, 980 (La. 1991)) (internal quotation marks omitted).

6

cian are entitled to more weight than are those of doctors who examined the plaintiff for only litigation purposes. *Schouest v. J. Ray McDermott & Co.*, 411 So. 2d 1042, 1044 (La. 1982). The plaintiffs use this to argue that because their experts testified that they were injured and needed the treatments they received, the jury had to accept their doctors' testimony over that of the defense expert. But the presumption does not give a treating physician unlimited credibility. Instead, the presumption means only that when considering who is more credible, the fact that treating physicians as a class are more credible must be given appropriate weight.

There was ample evidence from which the jury could have determined that the defense's doctor was still more credible. First, the jury heard live testimony from battling experts and evidence that though some diagnostic tests and examinations showed injuries, others came back negative. The defendants' expert testified that the positive diagnostics used were unreliable and that the tests that came back negative should be trusted. Also, the jury saw photographs of the accident, from which it could determine that the crash was minor. A fair interpretation of that evidence could lead a jury to believe Holladay that the injuries were just soft-tissue damage.

IV.

The plaintiffs also attempt to have this court disregard Holladay's testimony by arguing that (1) it is too biased to be considered; (2) he did not provide support for his statements; and (3) Louisiana courts have determined the tests and treatments at issue in this case to be valid as a matter of law. In *Ernst v. Taylor*, 17 So. 3d 981 (La. 3d Cir.), *writ denied*, 17 So. 3d 977 (La. 2009), the defendants brought an expert from Oregon to testify that the injury the plaintiff claimed to have suffered was no longer a diagnosis recognized by the medical profession. The expert had testified for a plaintiff in only two out of hundreds

No. 11-30467

of cases. *Id.* at 988.  His testimony also showed no basis or scientific support for his claims other than his own testing and his claim that other doctors supported his conclusions.  *Id.*  Other courts in other states had also recognized that he had a reputation for being hired to refute these claims.  *Id.*  In a few other cases, a doctor's testimony was prohibited after the court recognized a well-documented history of advocacy against plaintiffs.[5]

Here, there is no such well-documented pattern of bias by Holladay against injured plaintiffs.  He was not flown across the country, and the court has not found a similarly extensive pattern of advocacy in support of defendants. Finding an expert witness so biased that his testimony cannot be considered regardless of his credentials is not done lightly, and Holladay has not demonstrated the same level of malignance toward injured plaintiffs that it took for Louisiana courts to exclude experts in those cases.

The plaintiffs argue that Holladay's opinion testimony was unsupported and so should not be considered.  In *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987), we explained that although the basis of an expert's opinion usually goes to the weight, not the admissibility, of the testimony, "[i]n some cases, however, the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion.  Expert opinion testimony falls into this category when that testimony would not actually assist the jury in arriving at an intelligent and sound verdict."  In that case, the expert's opinion that Tordon 10k caused plaintiff's injuries was based on (1) a medical history that missed critical information on other possible causes, (2) tests that showed a possible toxic reaction but did nothing to identify the

---

[5] *White v. State Farm Mut. Auto. Ins. Co.*, 680 So.2d 1, 3 (La. 3d Cir. 1996); *see also Rowe v. State Farm Auto. Ins. Co.*, 670 So.2d 718, 723 (La. 3d Cir.) (finding that court erred in not allowing plaintiff to present the expert's bias, leading to reversal), *writ denied*, 673 So. 2d 611 (La. 1996).

cause, and (3) a study showing that rats exposed to large amounts of Tordon 10k got tumors, but without accounting for the different reactions to chemicals in humans versus rats or providing evidence the plaintiff was exposed to comparable amounts of the chemical. *Id.* at 423-24. The court determined that such an unsupported opinion was inadmissible because it does not objectively assist the jury in reaching a verdict. *Id.* at 424.

Although an expert's testimony must be reliable to be admissible, the opposing party must expose that lack of reliability. Holladay did not provide a completely unsupported opinion as did the expert did in *Viterbo*. When Holladay testified that discograms, IDET, and other injection procedures were not generally accepted, he cited a study by Dr. Chou, providing the year it was published, the journal, and a basic description of the study. He also mentioned that the American Academy of Orthopedic Surgeons had looked at that study and adopted it as its official policy, including it on its website to show that there is not good medical evidence to support those injection procedures.

"It is the responsibility of opposing counsel to explore the factual basis for the opinion and thus, determine its reliability." *Brown v. City of Madisonville*, 5 So. 3d 874, 880 (La. App. 1st Cir. 2008), *writ denied*, 1 So. 3d 498 (La. 2009). Because Holladay provided support for his position that the procedures used on the plaintiffs were invalid, and plaintiffs did not demonstrate sufficient support was lacking, his expert testimony was properly admitted.

Finally, the argument that Louisiana courts have determined IDET annuloplasty, discogram, and neurotomy to be legitimate as a matter of law conveys a fundamental misunderstanding of medical procedures and their evaluation in court. Louisiana courts cannot determine that these medical procedures are valid as a matter of law in all situations, because their validity in any particular instance is not a legal matter but a factual one. The validity and appropriateness of a medical diagnostic tool or procedure is not absolute; it can be valid in

one situation and invalid in another.

For example, some tools are better at showing certain types of injury than others. A doctor must often diagnose a patient based on the entirety of his medical evaluation, not from one test alone. Even if these procedures have been found valid in previous cases, each patient's medical situation is different, so previous courts' findings that the procedures were valid does not necessarily mean they were appropriate here. That is a factual matter the jury had to resolve. The evidence allowed the jury to determine that the tests that came back negative, such as the MRIs, were more reliable in this situation, and that decision was its to make.

In summary, because the district court properly allowed the jury to consider Holladay's testimony, and with that testimony the record contains adequate support for the verdict, we AFFIRM the judgment based on the damage award.